**574**

KENNEDY HEIGHTS APARTMENTS, LTD. I and Wilshire–Washington Heights, Limited Partnership, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 00–23C.

United States Court of Federal Claims.

Feb. 5, 2001.

John R. Riddle, Dallas, Texas, attorney of record for plaintiffs.

Marian E. Sullivan, Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and Todd M. Hughes, Assistant Director. Geoffrey L. Patton and Frank Elmer, Department of Housing and Urban Development, of counsel.

## OPINION

FUTEY, Judge.

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction. Plaintiffs Kennedy Heights Apartments, Ltd. I and Wilshire–Washington Heights, Limited Partnership have brought claims alleging monetary injury resulting from the improper application of the foreclosure provisions of the Multifamily Mortgage Foreclosure Act, 12 U.S.C. §§ 3701–3717 (1994) (MMFA), by the Department of Housing and Urban Development (HUD), acting on behalf of the United States government (defendant). In its motion brought pursuant to RCFC 12(b)(1), defendant argues that the MMFA cannot provide the basis for claims before this court, as it is not a money-mandating statute as required by the jurisdictional grant of the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994).[1] Plaintiffs dispute defendant's assertion, contending that their claims are within the court's Tucker Act jurisdiction, based on contractual and statutory grounds.

---

1. Plaintiffs argue that defendant's motion should have been brought pursuant to **RCFC** 12(b)(4), for failure to state a claim upon which relief may be granted, instead of **RCFC** 12(b)(1). This court and the United States Court of Appeals for the Federal Circuit (Federal Circuit) have made determinations on whether a statute is money-mandating on motions brought pursuant to both provisions of the rule. There is some dispute as to which motion is properly utilized in these situations. The fact remains, however, that the court must at some point make a decision concerning the alleged statutory mandate of the MMFA imposed on the government for the payment of money. The court will make that decision, therefore, at this time.

## Factual Background

Since the early 1970's plaintiffs had run two separate low-income housing projects, the Kennedy Heights Apartments and the Washington Heights Apartments, located in Kaufman County, Texas. Plaintiffs entered into contracts with HUD pursuant to the National Housing Act of 1937, ch. 847, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (1994 & Supp. V 1999)), to provide government-assisted low-income housing. In accordance with the Act, HUD insures the mortgage loans on the housing properties. 12 U.S.C. § 1703(a). Plaintiffs executed respective regulatory agreements with HUD describing the requirements for participation in the housing program. 12 U.S.C. § 1715z–1. In addition, pursuant to Section 8 of the United States Housing Act, 42 U.S.C. § 1437f (1994), HUD and plaintiffs entered into respective Housing Assistance Payments (HAP) contracts enabling the subsidization of rents within the projects.

Plaintiffs defaulted on their mortgage loans, and HUD took control of the properties until the time that they would be sold at a foreclosure sale. On August 3, 1998, pursuant to the MMFA, 12 U.S.C. § 3704, HUD appointed Duncan McMillan as a federal housing foreclosure commissioner (Commissioner), to preside over the foreclosure of plaintiffs' two properties. Acting within his authority under the MMFA and accompanying regulations, Mr. McMillan sold the properties to private bidders on August 28, 1998. The Kennedy Heights Apartments were sold for $1,120,000.00, and the Washington Heights Apartments were sold for $1,420,000.00.

Plaintiffs believed that the properties were both sold well in excess of the total amounts owed under the mortgages and the other debts of plaintiffs. According to plaintiffs' calculations, HUD had excess funds left from the sales in the amounts of $146,798.69 and $173,521.05 for the Kennedy Heights Apartments and the Washington Heights Apartments, respectively. Soon after the sales,

plaintiffs contacted Mr. McMillan to inquire into this alleged surplus, and asserted that they were entitled to the remaining portion of the sale prices under the MMFA and the appropriate regulations. Mr. McMillan informed plaintiffs that the mortgage debt coupled with HUD's costs in managing the properties amounted to a sum greater than the sale price of the two properties. Mr. McMillan therefore advised plaintiffs that he would be releasing the total amount of the two sales to HUD.

Plaintiffs attempted to block this release by filing a lawsuit against Mr. McMillan in state court in Texas. Plaintiffs were granted a temporary restraining order precluding Mr. McMillan from disbursing the alleged surplus to HUD. The two property sales closed on September 30, 1998, and October 1, 1998. At the time of payment, Mr. McMillan directed each purchaser to issue a separate check for the alleged surplus amount. Mr. McMillan then deposited the total surplus amount into the Registry of the 162nd Civil District Court of Dallas County, Texas.[2] *Kennedy Heights Apartments, Ltd. I v. McMillan,* 78 F.Supp.2d 562, 564–65 (N.D.Tex.1999).

Mr. McMillan removed the case to the United States District Court for the Northern District of Texas, and moved for summary judgment. The District Court *sua sponte* ordered the parties to brief the issue of whether the District Court or the United States Court of Federal Claims had jurisdiction over plaintiffs' claims. The District Court subsequently found that plaintiffs' claims are "properly brought under the Tucker Act because Plaintiffs seek monetary relief for which an adequate remedy exists in the Claims Court," and transferred the case here. *Kennedy Heights,* 78 F.Supp.2d at 571. Once in this court, on May 8, 2000, defendant filed a motion to dismiss for lack of subject matter jurisdiction. Plaintiffs subsequently amended their complaint to exclude two of the three counts in its original filings on July 6, 2000, and defendant filed its

---

**2.** It is not clear from the record whether the funds remain with the Dallas County District Court.

renewed motion to dismiss on September 8, 2000.[3]

## Discussion

In ruling on an RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court must accept as true the complaint's undisputed factual allegations and construe them in a light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States,* 29 Fed.Cl. 684, 686 (1993). If the undisputed facts reveal any possible basis on which the non-moving party may prevail, the court must deny the motion. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir. 1991). "The court should 'look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.'" *Farmers Grain,* 29 Fed.Cl. at 686 (quoting *Raymark Indus., Inc. v. United States,* 15 Cl.Ct. 334, 335 (1988)). Plaintiffs bear the burden of establishing subject matter jurisdiction. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); *Rocovich,* 933 F.2d at 993.

■ Defendant has brought a motion to dismiss for lack of subject matter jurisdiction, alleging that plaintiffs' claims are not within the purview of the Tucker Act, this court's primary source of jurisdiction. The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Consti-

tution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). In order to properly state claims pursuant to the Tucker Act, plaintiffs must base their claims on either (1) a contractual right, or (2) a constitutional provision, federal statute or regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967), *cited in Testan,* 424 U.S. at 400, 96 S.Ct. 948; *Pride v. United States,* 40 Fed.Cl. 730, 734 (1998).

■ Plaintiffs first make a nominal argument that their claims are properly before the court on contractual, and not purely statutory, grounds. Plaintiffs' claims, however, obviously stem directly from statutory and regulatory provisions, located in the MMFA, 12 U.S.C. § 3712, and 24 C.F.R. pt. 27 app. A § 11, 61 Fed.Reg. 48,552, 48,557 (Sept. 13, 1996) (not codified in Title 24 of the Code of Federal Regulations), which set out in detail the procedure for foreclosure sales such as the two conducted in this case.[4] Finding a basis for plaintiffs' claims in contract depends therefore on whether these two provisions were incorporated into one or more of the agreements plaintiffs have entered into with HUD. The federal government may make promises in contracts by including statutory or regulatory language, or by specifically referencing statutes or regulations, in the provisions of such contracts. "If the Government then violates those [statutes or]

---

**3.** The mere fact that the District Court has transferred the case to this court does not in any way establish this court's jurisdiction over the case. *See Bayship Mgmt., Inc. v. United States,* 43 Fed. Cl. 535, 536 (1999) (citing *Hambsch v. United States,* 857 F.2d 763, 764 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1054, 109 S.Ct. 1969, 104

L.Ed.2d 437 (1989)) (explaining that this court must make independent determinations of its own jurisdiction).

**4.** The pertinent language of the statute and the regulation is described infra.

regulations, it may become liable for damages for breach of contract." *Nutt v. United States*, 12 Cl.Ct. 345, 351 (1987) (citing *Dahl v. United States*, 695 F.2d 1373, 1376, 1381 (Fed.Cir.1982)), *aff'd sub nom., Smithson v. United States*, 847 F.2d 791, 794 (Fed.Cir. 1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).

■ The court must therefore determine whether the above-mentioned provisions are incorporated into any of the contractual agreements between HUD and plaintiffs. This question presents the court with questions of contract interpretation. The court may rule on such interpretations as a matter of law. *National Rural Utilities Cooperative Fin. Corp. v. United States*, 14 Cl.Ct. 130, 136 (1988), *aff'd*, 867 F.2d 1393 (Fed.Cir.1989). Contract interpretation begins with the plain meaning of the provision in question. *S.W. Aircraft Inc. v. United States*, 213 Ct.Cl. 206, 212, 551 F.2d 1208 (1977). In interpreting a contract, the court seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 235, 575 F.2d 855 (1978)). "[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 216 Ct.Cl. at 235–36, 575 F.2d 855.

■ Two provisions in plaintiffs' contracts with HUD might be interpreted to incorporate the statutory and regulatory provisions that plaintiffs' claims rely upon in this case. First, the parties' HAP contracts contain a "Scope of Contract" provision:

> This Contract and its exhibits comprise the entire agreement between the parties to this Contract with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, in any applicable regulations, in HUD's administrative procedures, or in agreements entered into in writing (e.g., the project Regulatory Agreement).

Although this language describes "any applicable regulations" as binding on the parties, the HAP contracts do not concern at all the conditions or procedures involved in foreclosure sales of plaintiffs' two respective properties. They instead deal solely with the conditions under which HUD would pay housing assistance to plaintiffs in order to defray costs in the housing projects. Foreclosure provisions therefore do not fall within the applicable regulations of the HAP contracts.

■ The regulatory agreements, however, do contain provisions concerning foreclosure and foreclosure sales:

> [U]pon ... default the Commissioner may:
>
> (a)(1) If the Commissioner holds the note—declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;
>
> (2) If said note is not held by the Commissioner—notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations. . . .

In this provision, the only language that might be construed to incorporate outside statutory or regulatory provisions is the "as provided in the Regulations" language at the end of section (a)(2). This language, however, pertains to the assignment of the note from the holder to the Commissioner. In section (a)(1), the provision gives the Commissioner the option to foreclose the mortgage, but does not include the regulations to be followed. In section (a)(2), foreclosure by the Commissioner is not contemplated. Instead, the provision allows the holder to foreclose or assign the note and mortgage to the Commissioner. Even if some regulations were effectively incorporated by the provision's general language, such regulations would not pertain to the Commissioner's duties in proceeding with foreclosure sales.

■ In addition, throughout both the HAP contracts and the regulatory agreements pertinent regulations and statutes are specifically referenced, with clear, binding language and citation to the provisions being incorporated. Yet, with regard to foreclosure, no specific mention is made of any statute or regulation. When a contract specifically includes certain statutes and regulations and leaves out others, the court will not take it upon itself to read more into the contract's terms than what was clearly the intention of the parties. *See Nat'l Leased Hous. Assoc. v. United States*, 32 Fed.Cl. 762, 766 (1995) (declining to incorporate outside regulations into a contract between HUD and the owner of a housing project), *aff'd*, 105 F.3d 1423, 1433 (Fed.Cir.1997); *Nutt*, 12 Cl.Ct. at 353. Here, the parties did not include the regulations concerning foreclosure, and therefore 12 U.S.C. § 3712 and 24 C.F.R. pt. 27 app. A § 11 are not incorporated into any of the contracts.

■ Because plaintiffs cannot rely on a contractual provision to bring their claims, the court must decide whether the MMFA provides an independent source of jurisdiction in this court by mandating the government's payment of money. This court and the Federal Circuit have relied on various factors to determine whether a statute is, in the terminology adopted by the courts, "money-mandating." Most importantly, although explicit statutory language providing a right to damages will certainly meet the money-mandating requirement, such language is not necessary in order for the statute to satisfy that requirement. *See Bowen v. Massachusetts*, 487 U.S. 879, 900 n. 31, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *Navajo Nation v. United States*, 46 Fed.Cl. 217, 228 (2000). "There are, of course, many statutory actions over which the Claims Court has jurisdiction that enforce a statutory mandate for the payment of money rather than obtain compensation for the Government's failure to so pay." *Bowen*, 487 U.S. at 900 n. 31, 108 S.Ct. 2722; *see, e.g., Testan*, 424 U.S. at 405, 96 S.Ct. 948 (interpreting the Back Pay Act, 5 U.S.C. § 5596(b) (1994), as money-mandating despite lack of specific language dictating compensation for damages); *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed.Cir.1999).

In order to be found money-mandating, a statute must "compensate a particular class of persons for past injuries or labors." *Bowen*, 487 U.S. at 906 n. 42, 907, 108 S.Ct. 2722 (holding that an ongoing relationship between a state and the federal government requiring payments pursuant to the Medicaid Act did not involve "past injuries or labors" when the requested relief would apply to future costs of the state).

■ If the payment of money pursuant to a statute is discretionary, however, the statute is not money-mandating. *See, e.g., Sarlund v. United States*, 39 Fed.Cl. 803, 805–07 (1998); *Niedbala v. United States*, 37 Fed.Cl. 43, 46 (1996). Nevertheless, if a statute provides an administrative step that is left to the government's discretion, when that step is taken and it creates the right to payment, the statute becomes money-mandating. *Hannon v. United States*, 29 Fed.Cl. 142, 147–48 (1993); *Averi v. United States*, 23 Cl.Ct. 127, 133 (1991). Similarly, if a statute allows discretion concerning the payment of money, but a regulation enacted to give effect to the statute mandates such payment, then the combination of the two is considered money-mandating. *See Yeskoo v. United States*, 34 Fed.Cl. 720, 729–30 (1996).

■ Plaintiffs have brought claims stating that they are statutorily entitled to receive surplus funds from defendant that remained from the purchase prices obtained by Mr. McMillan in his sale of their properties. The two pertinent provisions are 12 U.S.C. § 3712, and 24 C.F.R. pt. 27 app. A § 11. Section 3712, entitled "Disposition of sale proceeds," states:

> Money realized from a foreclosure sale shall be made available for obligation and expenditure—
>
> (1) first to cover the costs of foreclosure provided for in 3711 of this title;
>
> (2) then to pay valid tax liens or assessments prior to the mortgage;
>
> (3) then to pay any liens recorded prior to the recording of the mortgage which are required to be paid in conformity with the terms of sale in

the notice of default and foreclosure sale;

(4) then to service charges and advancements for taxes, assessments, and property insurance premiums;

(5) then to the interest;

(6) then to the principal balance secured by the mortgage (including expenditures for the necessary protection, preservation, and repair of the security property as authorized under the mortgage agreement and interest thereon if provided for in the mortgage agreement); and

(7) then to late charges.

Any surplus after payment of the foregoing shall be paid to holders of liens recorded after the mortgage and then to the appropriate mortgagor.

12 U.S.C. § 3712. Section 11 of Appendix A has the same heading as section 3712, and states that upon completion of the foreclosure sale by the Commissioner, after all other costs and claims are satisfied, the Commissioner "shall ... pay the surplus to the mortgagor." 24 C.F.R. pt. 27 app. A § 11(a)(9).

It is clear that both provisions, whether read together or separately, require defendant to pay any surplus money from a foreclosure sale to the mortgagor, in this case plaintiffs. The requirement to pay is not discretionary. Although the provisions do not provide specifically for the compensation for damage caused by defendant, the right to such payment as dictated by the provisions is "clear and strong." *See Cape Fox Corp. v. United States*, 4 Cl.Ct. 223, 232 (1983), *cited in Navajo Nation*, 46 Fed.Cl. at 228. Mr. McMillan, acting in his role as Commissioner, allegedly has failed in his foreclosure sale duties. Plaintiffs claim they have suffered an injury therefrom, namely, they have not been paid the surplus funds that are rightfully theirs according to law. HUD will be held accountable for this injury: "The Secretary [of HUD] shall be a guarantor of payment of any judgment against the foreclosure commissioner for damages based upon the commissioner's failure properly to perform the commissioner's duties." 12 U.S.C. § 3704. A one-time money remedy from this court would make plaintiffs whole. *See Kanemoto v. Reno*, 41 F.3d 641, 645 (Fed.Cir.1994). These provisions, therefore, "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Bowen*, 487 U.S. at 906 n. 42, 108 S.Ct. 2722. The court finds that the MMFA, 12 U.S.C. § 3712, and its related regulation pertaining to the disposition of foreclosure sale proceeds, 24 C.F.R. pt. 27 app. A § 11, are money-mandating provisions creating a right to bring suit in this court.[5]

### Conclusion

For the above-stated reasons, the pertinent provisions of the MMFA and its accompanying regulations are money-mandating, and require any surplus money from the foreclosure sale of plaintiffs' properties to be dispensed to plaintiffs.[6] Plaintiffs' claims come within the purview of this court's jurisdiction as defined in the Tucker Act. Defendant's motion to dismiss is therefore DENIED. The parties shall file a joint status report concerning further proceedings in this case by March 7, 2001.

IT IS SO ORDERED.

---

**5.** United States District Courts in the Eastern District of Louisiana and the Northern District of Texas have held that these provisions are money-mandating. *Oakbrook Village Assocs. v. Cisneros*, 25 F.Supp.2d 730 (E.D.La.1998); *Kennedy Heights*, 78 F.Supp.2d 562.

**6.** A surplus will exist if the total amount of the payment of the mortgage loans, HUD's reasonable management costs, and other costs described in the MMFA and its regulations is less than the amount the new owners paid for the properties. *See* 24 C.F.R. pt. 27 app. A § 11.